RENDERED: JUNE 18, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0154-WC

YAHAGI AMERICA MOLDING, INC.             APPELLANT

                    PETITION FOR REVIEW OF A DECISION
v.              OF THE WORKERS' COMPENSATION BOARD
                       ACTION NO. WC-17-88379

JULIE A. CRAINE; DR. CHRISTIAN UNICK;
DR. RASESH DESAI; INTERVENTIONAL
PAIN SPECIALISTS; HONORABLE TONYA
CLEMONS, ADMINISTRATIVE LAW JUDGE;
and WORKERS' COMPENSATION
BOARD                                      APPELLEES

## OPINION
## AFFIRMING

** ** ** ** **

BEFORE: COMBS, KRAMER, AND K. THOMPSON, JUDGES.

KRAMER, JUDGE: Yahagi America Molding, Inc. appeals from an opinion of

the Workers' Compensation Board affirming an award of benefits to its former

employee, appellee Julie A. Craine. Specifically, an Administrative Law Judge

("ALJ") determined Craine suffered a work-related low back injury on March 1, 2017, and that her injury necessitated a lumbar fusion surgery which Craine later received in 2018; awarded temporary total disability (TTD) benefits; and awarded permanent partial disability ("PPD") benefits based upon a 23% impairment rating, enhanced by the multipliers set forth in KRS[1] 342.730(4), (1)(c)1 and 3.

The overarching premise of Yahagi's appeal takes issue with the fact that the ALJ declined to "carve out" a percentage of Craine's award of PPD due to what Yahagi claims was Craine's "pre-existing active, symptomatic and impairment ratable condition" of her lower back. Yahagi argues the ALJ erred in this respect for two reasons. First, it contends the ALJ's decision erroneously relied upon a medical opinion from Dr. Robert Landsberg, who Yahagi asserts "clearly and objectively [did] not have a fully accurate and complete medical history" regarding the pre-injury condition of Craine's lower back. Second, Yahagi notes it adduced evidence below indicating that the pre-injury condition of Craine's lower back was both symptomatic and impairment-ratable. Upon review, we affirm.

In its separate opinion in this matter, the Board aptly summarized the relevant evidence and procedural history of this case as follows:

> Craine testified by deposition on November 1, 2017 and
> August 5, 2019, and at the hearing held July 29, 2020.

---

[1] Kentucky Revised Statute.

Craine began working for Yahagi, an automotive parts manufacturer, in October 2015, where she packaged car parts. On March 1, 2017, she reached into a box that was chest level and felt a pull in her low back with immediate ensuing stiffness and pain. Craine treats with her primary care physician for rheumatoid arthritis and depression. She testified she was involved in a motor vehicle accident ("MVA") in 2014 resulting in a concussion and a neck injury, for which she received chiropractic treatment. Craine denied injuring her low back in the MVA.

In her second deposition, Craine testified she had not worked since two days after the March 2017 work incident. Following a June 2018 fusion surgery, she continued to experience back and bilateral leg pain that she associated with the work incident. She did not believe she could return to her prior employment with Yahagi because she had difficulty with standing, lifting, and bending. She previously worked twelve to fourteen hours per day, six days per week for Yahagi. After reviewing medical records pre-dating the March 2017 work incident, she recalled she had some back problems related to the MVA in 2014 for which she had an MRI. She also testified she occasionally treated from July 2016 through December 2016, and reported back pain that she attributed to her rheumatoid arthritis. Craine stated that she was able to manage those symptoms and work without restrictions before the March 1, 2017 work event.

At the hearing, Craine testified her job with Yahagi required lifting forty pounds and standing for long periods. She testified she cannot lift that weight now, nor can she stand for eight to twelve hours, even with breaks. Craine reiterated she had a low back condition prior to the March 2017 work incident, but she was able to work approximately sixty to sixty-five hours per week. Following her June 25, 2018 spinal surgery, she is unable to stand over ten to fifteen minutes or perform household chores without breaks. Craine acknowledged she was

-3-

prescribed the same medications prior to and after the March 2017 work incident, but stated she did not have to rely on the medications as much prior to the work event. Following the March 2017 incident and June 2018 surgery, she needs medication daily.

Yahagi submitted records of medical treatment predating the alleged injury. Records from October 14, 2014 through December 3, 2014 from Heartland Rehabilitation Services indicate Craine was seen for complaints of dizziness. The records also reflect a diagnosis of lumbosacral neuritis NOS.

Yahagi introduced diagnostic studies from TJ Samson Health Pavilion predating the alleged injury. An August 30, 2013 lumbar X-ray showed bilateral pars defects and a spondylolisthesis of L5. An August 11, 2014 X-ray of the lumbar spine showed mild multi-level disc space narrowing at L4-5 and L5-S1 with mild spondylolysis. An October 15, 2014 lumbar MRI showed a Grade 1 spondylolisthesis of L5 on S1, asymmetric bulge at L5-S1, and a mild disc bulge at L3-4.

Dr. John Jones, D.C. treated Craine beginning on August 22, 2014 for injuries sustained in an August 10, 2014 MVA. Craine reported she "felt pain immediately in the mid back, neck, upper back and shoulder and down into the low back." Dr. Jones diagnosed strain/sprain injuries to the cervical, thoracic, and lumbar spine with evidence of nerve compression in the lumbar and cervical spine. X-rays revealed a mild spondylolisthesis at L5 on S1. He primarily treated her cervical condition. He consistently classified the thoracic, shoulder, and low back conditions as secondary complaints. Throughout most of 2014, he frequently noted the low back complaint as improving. In November and December 2014, he noted increased complaints related to the low back. No treatment notes were submitted after December 15, 2014 until August 13, 2015. The last note from Dr. Jones on May 19, 2016 indicates Craine experienced mid-thoracic pain down to

-4-

her lumbar spine. Palpation revealed tension and spasm, hypo-mobility, and end-point tenderness indicative of subluxation at L5, right pelvis, and L2.

Yahagi filed records from Cave City Prescription Center documenting prescriptions in 2014, 2016, and February 2017 for Meloxicam, Nabumetone, Ibuprophen, Celecoxib, Meloxicam, Diclofenac, Cyclobenzaprine, Hydrocodone, and Gabapentin.

Dr. Swaranjit K. Chani of Caverna Primary Care saw Craine on May 13, 2016. Craine reported weakness, fatigue, and dull aching low back pain. Craine returned on May 16, 2016, reporting left-sided low back pain.

Dr. Manmeet Sandhu saw Craine on October 26, 2016, for a post-operative check following a tubal ligation. Craine reported some pain in the right back and abdomen following heavy lifting at home. Dr. Sandhu diagnosed a muscle strain.

Yahagi submitted records from Dr. Asad Fraser of the Graves-Gilbert Clinic. On an October 26, 2016 intake form, Craine checked that she had experienced back, neck, and joint pain within the past month. Dr. Fraser obtained X-rays of the lumbar spine that revealed Grade 1 spondylolisthesis at the lumbosacral junction and mild degenerative changes of the lumbar spine. Craine also reported back pain on November 17, 2016 and December 27, 2016.

Dr. Thomas O'Brien evaluated Craine on August 18, 2017. He summarized voluminous treatment and diagnostic records predating the alleged work injury as well as those following the injury. Dr. O'Brien diagnosed chronic low back pain secondary to congenital L5-S1 spondylolisthesis and multilevel degenerative disc disease. Dr. O'Brien found Craine did not sustain a work-related injury on March 1, 2017. He opined the incident on that date was a manifestation and natural

history of degenerative disc disease in a middle-aged overweight patient with congenital L5-S1 spondylolisthesis. Dr. O'Brien stated the work activities on that date did not cause a temporary or permanent aggravation, acceleration, or precipitation of these pre-existing conditions. He believed the incident did not cause any type of structural change. Dr. O'Brien noted the 2017 lumbar MRI showed the same multilevel degenerative changes and congenital defect that was apparent on the October 14, 2014 MRI.

Likewise, X-rays of the lumbar spine on October 26, 2016 showed the same degenerative changes and congenital defect that were apparent on subsequent imaging studies after March 1, 2017. Dr. O'Brien further noted Craine had five out of five positive Wadell's signs, supporting a non-organic, non-physiologic aspect to her subjective complaints. He stated there is no physiologic or anatomic basis for assigning restrictions and assigned a 0% impairment rating related to the alleged injury pursuant to the 5th Edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, ("AMA Guides"). Dr. O'Brien stated Craine had an 8% pre-existing active impairment rating for her degenerative disc disease with congenital L5-S1 spondylolisthesis.

In a March 29, 2018 supplemental report, Dr. O'Brien stated his review of additional medical evidence supports his opinion that the progression of the spondylolisthesis is not work-related. He stated any worsening of symptoms relates to the natural progression of her condition. Dr. O'Brien reiterated that the alleged work incident did not rise to the level of an injury. The work activity described did not involve biomechanical forces that would result in any type of injury. Dr. O'Brien disagreed with Dr. Stephen M. Neely's opinion that progression of her spondylolisthesis is related to the work incident.

Dr. Neely examined Craine on March 13, 2018. Craine gave a history of the March 1, 2017 work injury. Dr. Neely indicated he reviewed Dr. Jones' records. X-rays following the 2014 MVA revealed a possible mild spondylolisthesis. Dr. Neely diagnosed an exacerbation of Craine's pre-existing spondylolisthesis. He stated Craine's spondylolisthesis progressed from Grade 1 to Grade 2 and assigned an 8% impairment rating pursuant to the AMA Guides. In a supplemental report, Dr. Neely stated the work incident proximately caused a harmful change to the human organism based upon objective medical findings.

Dr. Thomas Loeb evaluated Craine on September 17, 2019. Dr. Loeb stated Craine had longstanding active pre-existing congenital spondylolisthesis at L5-S1 with L5 pars defect and was status post posterior lumbar fusion with post-laminectomy syndrome. He opined she had a transient strain of the lumbosacral spine from her work injury. He did not believe the work incident caused, nor exacerbated, her underlying longstanding, active, pre-existing problem. Dr. Loeb felt Craine reached maximum medical improvement approximately four to six weeks after the date of injury. He stated her pre-injury impairment is difficult to assess due to a lack of measurements in change in flexion and extension on radiographs. However, he felt Craine had a 20% impairment rating pursuant to the AMA Guides [sic] prior to her surgery, and 23% post-fusion. He did not feel the mechanism of injury included enough force to worsen her underlying condition. He felt any progression was within the parameters and natural course of the disease process. He did not believe that she required any restrictions or medical treatment due to the work-related injury and would be able to return to her job were it not for her underlying pre-existing condition.

In a February 19, 2020 supplemental report, Dr. Loeb stated, after review of surveillance video, he believed Craine could perform her work duties without minimal

restrictions and did not need pain management. He continued to believe her impairment rating is 100% pre-existing and not work-related.

Dr. Rasesh Desai saw Craine on June 16, 2017, for low back pain with a report of a back injury at work in March 2017. She was reaching and felt a tightness and sharp pain in her back. Since that time, her pain had become constant and severe, and caused numbness and tingling. She also reported pain in her bilateral lower extremities. Dr. Desai noted a comparison of X-rays from March 2017 to the date of the examination showed a progression of the previous spondylolisthesis. He recommended use of a back brace and referred her to pain management for a trial of lumbar epidural steroid injections. If there was no improvement of pain, he felt Craine might be a surgical candidate. Dr. Desai performed a lumbar fusion on June 25, 2018. On November 9, 2018, he indicated Craine was referred to pain management for SI joint injections bilaterally as well as chronic pain management. Dr. Desai recommended a lumbar CT scan to evaluate the fusion.

Dr. Robert Landsberg examined Craine on September 18, 2019. Craine stated she was able to perform factory work without difficulty for two years until a March 1, 2017 injury. She reported averaging 100 hours for each two-week period prior to the injury. She also reported a 2014 MVA when she injured her neck and underwent chiropractic treatment. Dr. Landsberg noted she had a lumbar MRI in 2014 that showed bilateral L5 pars defects with a Grade 1 spondylolisthesis, although Craine reported she was not experiencing pain. Dr. Landsberg provided a summary of copious medical records he reviewed, including Dr. Neely's March 13, 2018 report, and Dr. O'Brien's records and August 18, 2017 report. Dr. Landsberg specifically referred to Dr. O'Brien having reviewed X-rays from 2013 showing pars defects and spondylolisthesis; having been in an MVA in 2014 resulting in X-rays; receiving chiropractic treatment in

2014; and having a lumbar MRI in October 2014. Dr. Landsberg also noted Dr. Fraser's notes from 2016 contained complaints of back pain.

Dr. Landberg diagnosed Craine with an aggravation and advancement of a pre-existing spondylolytic spondylolisthesis of the lumbar spine, secondary to a March 1, 2017 work injury, with ongoing back pain and stiffness. He stated the work injury aggravated, advanced, and brought into disabling reality the pre-existing relatively dormant condition of her spine. Dr. Landsberg stated, "Had it not been for the work injury, she would not have developed the progressive back problems requiring the lumbar spine fusion surgery." He assessed a 23% impairment rating pursuant to the AMA Guides using the DRE method following the two level fusion and found Craine completely disabled from the lumbar injury. He recommended permanent restrictions of no bending or stooping, no sitting for more than 20-25 minutes, no riding in the car for 20-25 minutes at a time, avoid standing for more than 10 minutes at a time, and no lifting of more than five pounds. After review of a surveillance report and video, Dr. Landsberg issued a March 9, 2020 addendum. His review did not alter his original opinion that Craine suffered an aggravation of a pre-existing, relatively dormant condition that was brought into a disabling reality by the work accident. He also reaffirmed the 23% impairment rating.

Yahagi submitted a March 1, 2017 X-ray report revealing bilateral pars defects with a Grade 1 spondylolisthesis of L5 on S1, mild degenerative changes, and degenerative disc disease at L5-S1. An April 11, 2017 MRI revealed bilateral pars defects with a Grade 1 spondylolisthesis, mild hypertrophic changes, and multilevel discogenic disease with moderate bilateral foraminal stenosis at L5-S1.

-9-

At the Benefit Review Conference and Final Hearing, the parties stipulated the remaining issues for determination were:

> "Injury," as defined by the Act, i.e. whether injury is temporary or permanent; Permanent income benefits per KRS 342.730; Permanent total disability; Exclusion for pre-existing impairment; Ability to return to work; TTD Benefits; Unpaid or contested medical expenses; MFD filed by Defendant/Employer regarding surgery recommended by Dr. Desai.

The ALJ considered the evidence of record and made the following findings of facts and conclusions of law relative to the issues on appeal, which are set forth, *verbatim*:

> Plaintiff argues that she suffered a permanent injury that caused her to discontinue work and subsequently led to a two-level spinal fusion. Defendant, on the other hand, essentially argues that Plaintiff had a pre-existing, active condition that returned to its baseline state within four to six weeks of the alleged work injury. There is conflicting evidence on this issue.
>
> The courts of this jurisdiction have explained both temporary and permanent injuries as well as pre-existing conditions and how those interact with a work-related injury. In Kentucky, an injury may be temporary, requiring the payment of TTD benefits and temporary medical benefits, while not resulting in permanent change to the human organism that qualifies for permanent disability benefits or medical

-10-

benefits. <u>Robertson v. UPS</u>, 64 S.W.3d 284 (Ky. 2001).

It is not disputed in this matter that, based upon medical records and testimony, Plaintiff had pre-existing conditions of L5/S1 spondylolisthesis as well as rheumatoid arthritis, which she asserts mainly affected her hands. These conditions and treatment are reflected in records from Heartland Rehabilitation Services, Jones' Chiropractic, Dr. Fraser, and a prescription ledger from Cave City Pharmacy. Despite those pre-existing conditions, it is undisputed—and the wage records substantiate—that Plaintiff was able to work in her regular position pre-injury for forty hours per week with significant overtime, which was confirmed by Plaintiff's credible testimony on that issue.

While there is a period of absence from work in 2016 noted in the wage records, there is no indication that any such absence was due to any non-workrelated [sic], low back condition. In fact, Ms. Craine testified at her formal hearing that she was absent from work during this period due to a difficult, non-workrelated [sic] hysterectomy procedure. Otherwise, she testified that she was able to manage her symptoms without significant treatment prior to March 2017.

Ms. Craine, however, suffered an injury on March 1, 2017 that led to a condition that did not subside. Based upon the records of Dr. Desai, a comparison of diagnostic studies from March 2017 to May 2017 showed a progression of the spondylolisthesis condition from grade 1 to

grade 2. Likewise, the April 11, 2017 lumbar MRI report makes reference to a comparison to October 2014 studies and finds that there was increased moderate bilateral foraminal stenosis at the L5/S1.

There is no indication that there were any restrictions to Plaintiff's low back prior to the March 1, 2017 incident that prevented Ms. Craine from performing her normal duties as a packer for Defendant. Further, there is no indication that Plaintiff was a surgical candidate prior to the March 1, 2017 incident.

Following the incident, however, Ms. Craine has been unable to work except for a two day period in late March 2017 when she returned to light duty work, but was sent home by Defendant due to pain. She has been unable to return to work for Defendant since that time. Thus, based upon the records from Dr. Fraser and Dr. Desai, the diagnostic studies, the wage records, and Ms. Craine's testimony, the Administrative Law Judge finds that any pre-existing low back conditions were permanently exacerbated by the March 1, 2017 work-place injury.

With respect to the L4 through S1 fusion procedure performed by Dr. Desai on June 25, 2018, Plaintiff argues that the surgery is due to the work injury based upon the opinions of Dr. Neely, Dr. Landsberg, and Dr. Desai. Defendant argues that the same was reasonable and necessary to treat Plaintiff's condition, but it was for Ms. Craine's congenital and long-standing back problems not the work injury based upon the

opinions of Dr. Goldman, Dr. O'Brien, and Dr. Loeb. As noted, the medical evidence prior to the work incident from Hartland Rehabilitation, Jones Chiropractic, Dr. Chani, or Dr. Fraser does not indicate that Ms. Craine was a surgical candidate for her low back prior to March 1, 2017. The medical records of Dr. Desai and diagnostic studies following the work incident when compared to pre-injury records and studies substantiate the lack of prior surgical recommendation for the lumbar spine. Moreover, the opinions of Dr. Landsberg reflect that March 2017 work incident contributed more than fifty percent of her need for further treatment and spine surgery. Finally, Plaintiff testified that she was able to manage any symptoms and problems in her back prior to the work incident. Accordingly, based upon the medical records of Dr. Desai, various diagnostic studies, the opinions of Dr. Landsberg, and Plaintiff's testimony, the ALJ finds that the June 25, 2018 L4/5 and L5/S1 posterior spinal fusion is related to the March 1, 2017 work injury and[,] thus, is compensable by Defendant.

Regarding the issue of whether Craine suffered from a pre-existing active lumbar spine condition, the ALJ made the following findings and conclusions:

The issue now becomes the extent and duration of Plaintiff's disability. Plaintiff argues that due to the March 1, 2017 incident, she has a 23% AMA impairment rating as a result of this injury and the fusion procedure per the opinions of Dr. Landsberg. Moreover, when the physical limitations caused by the injury are taken

into consideration, Plaintiff believes that she is permanently and totally disabled.

Defendant, on the other hand, argues that the facts of this case are that, at best, the fusion surgery was not work-related and no permanent impairment is due to the injury. Alternatively, Defendant argues that while Dr. Loeb assessed 23% impairment, Plaintiff had a pre-existing, active condition with either 8% or 20% pre-existing impairment for which it is entitled to a carve-out from its liability for income benefits.

While Ms. Craine had pre-injury symptoms in her low back, those symptoms and treatment were episodic at best. First, the records of evidence reflect that she treated in October 2014 following a motor vehicle accident. There is then a gap in any treatment records until May 2016. While she had lumbar pain complaints, the prescription ledger does not indicate that she was specifically taking any medications for pain at that time. Additionally, from July 2016 through December 2016, Plaintiff testified at her formal hearing that she was off work due to a difficult hysterectomy. Records from Dr. Sandhu indicate that she was seen in October 2016 for a post-operative check after lifting at home. The records of Dr. Fraser reflect that Plaintiff was seen in October through December 2016 for her rheumatoid arthritis in her right hip, hands, and neck. While Defendant relies on the opinions of Dr. O'Brien indicating that in December 2016, Plaintiff reported pain at a 10/10 including generalized back pain, the actual records do not appear to substantiate the same.

-14-

Overall, the Administrative Law Judge found Ms. Craine to be a credible witness. She testified that she continues to have pain in her low back that radiates to her bilateral lower extremities that was at a greater degree of severity following the March 1, 2017 incident than it was prior to the work event. She also testified that she was fully functional and without physical limitation to her low back before that incident. Her wage records reflect that upon her return to work in early December 2016, Plaintiff was able to work for more than forty hours per week. The IME report of Dr. Landsberg indicates that for his original evaluation, he had the opportunity to review the original report of Dr. O'Brien where Plaintiff's pre-injury treatment was laid out and a pre-existing impairment was assessed.

Based upon the records of Dr. Fraser, Dr. Chani, diagnostic studies, prescriptions ledgers, Plaintiff's wage records, and her testimony, the Administrative Law Judge does not find the opinion of Dr. Loeb apportioning 20% to a pre-existing, active condition or the opinions of Dr. O'Brien apportioning 8% to a preexisting, active condition credible or persuasive as Plaintiff was able to function without restrictions immediately prior to the March 1, 2017 incident. Accordingly, based upon the aforementioned records along with the records of Dr. Desai and the opinions of Dr. Landsberg, the ALJ finds that Plaintiff has 23% impairment due to the work incident for the March 1, 2017 work incident. A 23% AMA impairment results in a 26.45% permanent disability rating.

Yahagi filed a Petition for Reconsideration requesting the ALJ correct what it believed was an error on her part, and to assign a pre-existing active impairment, thereby reducing the amount of the PPD benefits awarded. The ALJ denied this petition, reiterating her opinion that her original findings were supported by the evidence.

Yahagi appealed to the Board, raising the same arguments it has raised before this Court. The Board affirmed, and this appeal followed. As discussed, Yahagi's first argument is that Dr. Landsberg "clearly and objectively [did] not have a fully accurate and complete medical history" regarding the pre-injury condition of Craine's lower back. Accordingly, Yahagi reasons, Dr. Landsberg's IME – upon which the ALJ relied in determining a "carve-out" for preexisting injury was unwarranted – could not have qualified as the requisite "substantial evidence" necessary to support such a finding and was therefore arbitrary.

Appellate courts may not second guess or disturb discretionary decisions of an ALJ unless those decisions amount to an abuse of discretion. *Medley v. Bd. of Educ., Shelby Cty.*, 168 S.W.3d 398, 406 (Ky. App. 2004). Discretion is abused only when an ALJ's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Downing v. Downing*, 45 S.W.3d 449, 454 (Ky. App. 2001). And, in general, "arbitrariness" arises when an ALJ renders a decision on less than substantial evidence. *K & P Grocery, Inc. v.*

-16-

*Commonwealth, Cabinet for Health Servs.*, 103 S.W.3d 701, 703-04 (Ky. App. 2002). "Substantial evidence" is "that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." *Bowling v. Nat'l Res. & Envt'l Prot. Cabinet*, 891 S.W.2d 406, 409 (Ky. App. 1994).

As to why Yahagi believes Dr. Landsberg's IME fell short of qualifying as substantial evidence, Yahagi points out that his IME did not review the following information:

- The ledger of prescription medications Craine filled pre-injury;

- The records of Dr. John Jones, DC;

- The records of Dr. Asad Fraser;

- Dr. O'Brien's supplemental report; and

- The IME and supplemental report of Dr. Thomas Loeb.

Having failed to specifically review this information, Yahagi reasons, Dr. Landsberg's IME was therefore akin to medical evidence that the Kentucky Supreme Court deemed insufficient in *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839 (Ky. 2004).

We disagree. In *Cepero*, an ALJ awarded a claimant benefits for an alleged work-related knee injury based upon evidence from two doctors who indicated that his knee condition was related to a work injury. However, neither

-17-

doctor had been informed that Cepero had suffered a severe knee injury several years prior. *Id.* at 842. The Board reversed the ALJ's finding that the doctors' opinions were based upon substantial evidence and therefore sufficient to support findings of causation. The Supreme Court of Kentucky affirmed, quoting the Board's holding:

> [I]n cases such as this, where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.

*Id.*

In *Eddie's Service Center v. Thomas*, 503 S.W.3d 881 (Ky. 2016), the Supreme Court of Kentucky applied *Cepero* to hold that an ALJ has the discretion to reject a medical report based on a substantially inaccurate understanding of the facts and medical history. *Id.* at 887-89. Our Supreme Court held that because of several internal inconsistencies within the report, along with the doctor's inaccurate understanding of the facts, the report could not constitute substantial evidence. *Id.* at 889.

This Court also held in *GSI Commerce v. Thompson*, 409 S.W.3d 361 (Ky. App. 2012), that an ALJ was not required to disregard a medical report that

-18-

was "not 'unsupported by any other credible evidence.'" *Id.* at 365. There, an employer contended that a physician's report could not be considered because it did not mention a prior relevant injury; however, the doctor explained during deposition that he was aware of the claimant's past injury. *Id.* We differentiated between *GSI Commerce* and *Cepero*, stating, "[i]n *Cepero*, there was a *complete omission* of a significant and clearly relevant past injury . . . [and] the medical opinion described in *Cepero* was completely unsupported by any other credible evidence." *Id.* at 364 (emphasis in original). Conversely, in *GSI Commerce*, the physician making the report was aware of the prior injury, and there was other evidence before the court corroborating the physician's opinion. *Id.* at 365.

With that said, we cannot agree with Yahagi's contention that the ALJ erred in relying upon Dr. Landsberg's IME. True, Dr. Landsberg may not have been aware of *all the evidence adduced regarding* the pre-injury condition of Craine's low back. But, he *was* aware of the preexisting condition of Craine's low back. As the ALJ noted:

> The IME report of Dr. Landsberg indicates that for his original evaluation, he had the opportunity to review the original report of Dr. O'Brien where Plaintiff's pre-injury treatment was laid out and a pre-existing impairment was assessed.

And, as the Board further observed:

> Dr. Landsberg provided a summary of copious medical records he reviewed, including Dr. Neely's March 13,

2018 report, and Dr. O'Brien's records and August 18, 2017 report. Dr. Landsberg specifically referred to Dr. O'Brien having reviewed X-rays from 2013 showing pars defects and spondylolisthesis; [Craine] having been in an MVA in 2014 resulting in X-rays; receiving chiropractic treatment in 2014; and having a lumbar MRI in October 2014. Dr. Landsberg also noted Dr. Fraser's notes from 2016 contained complaints of back pain.

Accordingly, it is not "irrefutable" that Dr. Landsberg was unaware of Craine's personal medical history or that his IME was "substantially inaccurate or largely incomplete." *Cepero*, 132 S.W.3d at 842. Dr. Landsberg had the opportunity to examine Craine as well as review evidence of the pre-existing condition of her low back. Thus, we cannot conclude that his IME was so corrupt as to make it incapable of being substantial evidence. Instead, the amount of knowledge that Dr. Landsberg had regarding the cause and pre-existing condition of Craine's low back condition goes to the overall weight that the ALJ chose to afford his opinion. And, the ALJ is the finder of fact and is the only body that "has the . . . authority to determine the quality, character, and substance of the evidence." *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993) (citation omitted).

Yahagi's second argument, as discussed, is that the ALJ erred by misconstruing evidence, controlling precedent, or by failing to entertain the proper analysis of relevant factors in determining that a "carve-out" of Craine's award was unwarranted. Yahagi asserts that it clearly met its burden of proving that

Craine suffered from a pre-existing active lumbar condition that was both impairment ratable and symptomatic at the time of the March 1, 2017 work incident.

We disagree. The Board properly addressed this argument in its affirming opinion, and we adopt its analysis as set forth below:

> The test to determine whether an injured worker suffers from a pre-existing active condition was set forth in the case of Finley v. DBM Technologies, [217 S.W.3d 261 (Ky. App. 2007)]. It is a two-part test that places the burden on the employer to submit proof showing two things. First, it must prove that the worker retained an impairment to the body part alleged to have been injured in the work incident. Second, it must prove the pre-existing condition was also symptomatic.
>
> While the ALJ did not specifically cite the Finley case, it is clear she understood the law, the burden of proof, and the evidence. The ALJ was confronted with conflicting medical evidence. The first step of the Finley test was arguably met with testimony from Dr. Loeb and Dr. O'Brien assessing a pre-existing active lumbar spine impairment rating. The testimony from Dr. [Landsberg[2]] indicated he did not believe Craine retained a pre-existing impairment rating to her lumbar spine. The evidence regarding application of part two of the test, whether the pre-existing condition was symptomatic, was likewise disputed. Yahagi submitted various medical records indicating medical treatment and medications received by Craine prior to the March 1, 2017 work incident for treatment of her lumbar spine. Yahagi argues this evidence leads to the logical conclusion that Craine's lumbar spine condition was symptomatic at the

---

[2] We have bracketed "Dr. Landsberg" twice in this block quote because, due to an apparent typographical error, the Board twice referred to Dr. Landsberg as "Dr. Lunsford."

time of the March 1, 2017 work incident. Conversely, Craine testified that she was not suffering from a symptomatic active lumbar spine condition at the time of the March 1, 2017 incident, and in fact was working a lot of overtime without issue or under any restrictions. She additionally submitted evidence from Dr. [Landsberg] opining her lumbar spine was not both impairment ratable and symptomatic at the time of her work injury.

The ALJ performed the proper analysis and reached a determination supported by the evidence in finding Yahagi did not meet its burden of proving Craine was suffering from a pre-existing active lumbar condition that was both impairment ratable and symptomatic immediately prior to the March 1, 2017 work injury. The ALJ properly exercised her discretion as the trier of fact in weighing the evidence and making a decision. The decision is based on a proper review of the facts and law and will not be disturbed on appeal.

Under KRS 342.285, the ALJ is the sole factfinder in all workers' compensation claims. "KRS 342.285 designates the ALJ as finder of fact, and has been construed to mean that the factfinder has the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence, and to draw reasonable inferences from the evidence." *Bowerman v. Black Equipment Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009). Here, while Yahagi may have carried its burden of *proof* with respect to whether Craine suffered from a preexisting active impairment, it was the ALJ's prerogative to find the conflicting evidence more *persuasive*. And, although a different outcome may have been reached by the ALJ, we are not empowered on appeal to disregard an ALJ's determination if substantial

-22-

evidence underpins such decision.  *See McCloud v. Beth-Elkhorn Corp.*, 514 S.W.2d 46, 47 (Ky. 1974).  Because the ALJ based its determination upon substantial evidence, the ALJ therefore committed no error.

Yahagi also argues a carve-out is mandated because this case is akin to the now-final and to-be-published case of *ViWin Tech Windows & Doors, Inc. v. Ivey*, 621 S.W.3d 153 (Ky. 2021).  There, reversing this Court's determination to the contrary, the Kentucky Supreme Court determined a carve-out was warranted even though the claimant – as the ALJ found here – had an asymptomatic preexisting condition in the location of his work injury.  However, as the Kentucky Supreme Court further observed in that matter, that claimant, Ivey, had previously undergone two surgeries at the precise location of his work-related injury (*i.e.*, at the L4-5 level of his back).  Thus, although Ivey had been asymptomatic prior to his work injury, an impairment rating attributable to his pre-existing condition was nevertheless required under the AMA <u>Guides</u> because, as the Supreme Court explained:

> Under the AMA Guides, Table 15.3 specifically states that a person is to be rated with lumbar DRE III (10 to 13%) impairment if he has "history of a herniated disc at the level and on the side that would be expected from objective clinical findings, and/**or individuals who had surgery for radiculopathy but are now asymptomatic**." AMA Guides at 384 (emphasis added). Thus, based on a plain reading of the statutes and the Guides, the ALJ erred in concluding that a carve-out was unwarranted.

*Id*. at 158.  Here, unlike Ivey, Craine had no prior surgeries in the location of her work injury.  Therefore, the reasoning of *ViWin* does not apply.

The function of this Court is to review the Board's decision solely to determine whether the Board has "overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice."  *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992).  The Board committed no such errors in this matter.  Therefore, we AFFIRM.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE, JULIE A. CRAINE: |
| --- | --- |
| Sherri Keller | |
| Lexington, Kentucky | Donald D. Zuccarello |
| | Brentwood, Tennessee |