RENDERED: FEBRUARY 17, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0797-WC

KENNETH TURNER APPELLANT

PETITION FOR REVIEW OF A DECISION
v. OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-15-94425

COMMONWEALTH OF KENTUCKY-
DEPARTMENT OF CORRECTIONS;
HONORABLE JONATHAN ROBERT
WEATHERBY, JR.,
ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION
BOARD APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, EASTON, AND JONES, JUDGES.

JONES, JUDGE: The Appellant, Kenneth Turner, seeks review of the June 18,

2021, opinion of the Workers' Compensation Board ("Board"), wherein the Board

affirmed the Administrative Law Judge's ("ALJ") order on remand. Having reviewed the record and being otherwise sufficiently advised, we affirm the Board.

## I. BACKGROUND

In 2015, Turner was 58 years old and employed by the Department of Corrections as a full-time maintenance employee. He performed most of his duties at the Kentucky State Penitentiary in Eddyville, Kentucky, taking care of plumbing, electrical, and air conditioning issues. Turner's job duties required him to lift and carry heavy items and climb ladders.

Turner worked the night shift at the penitentiary on February 15, 2015, and some overtime the following the day. Sometime between 2:00 p.m. and 3:00 p.m. on February 16, 2015, Turner was sent to return a key to the yard office after which he planned to clock out and go home. After returning his key, Turner attempted to walk along a sidewalk within the penitentiary. It had been snowing the night before, and there was snow and ice on the walkway. Turner slipped and fell on the icy sidewalk. As part of this claim, Turner alleges that he injured his hip, ribs, right shoulder, and neck when he fell. Only Turner's alleged neck injury remains at issue.

The following week, on February 23, 2015, Turner visited his family practitioner, Holly McCormick, APRN, with complaints of headaches, right shoulder pain, and right-sided chest pain; it does not appear that Turner

complained of any neck pain at that time. Turner described his fall to Nurse McCormick. She ordered x-rays and a CT scan. The x-rays revealed a shoulder abnormality of the clavicle and in the AC joint and broken ribs. Nurse McCormick referred Turner to an orthopedic surgeon for his shoulder condition. Turner returned to Nurse McCormick on March 4, 2015, with continued complaints of pain in his right shoulder and ribs. He did not make complaints of neck pain at this time either. Nurse McCormick referred Turner to the Trigg County Hospital Rehabilitation Department ("Trigg County") for physical therapy.

Turner complained of right upper extremity radicular pain during his first physical therapy appointment on March 24, 2015. At a March 31, 2015, visit, Turner again complained of right upper extremity pain with headaches, and the office notes indicate cervical pathology was suspected.

Turner returned to Nurse McCormick again on April 6, 2015, because of his neck pain, which he reported was gradually worsening since his fall. Nurse McCormick noted that Turner reported to her that he had been having issues with neck pain since his work accident, and that it had been coming on gradually after the work accident. Turner continued his complaints on April 13, 2015. According to office notes, Turner had a positive Spurling's test for cervical radiculitis and demonstrated limited cervical range of motion.

Nurse McCormick referred Turner to Dr. Chang after an MRI revealed pathology within Turner's shoulder, and Dr. Chang recommended Turner visit a cervical specialist. On May 7, 2015, Nurse McCormick noted that Turner was still having difficulties with his neck and was awaiting a referral to an orthopedic specialist for the condition. On July 16, 2015, Nurse McCormick observed that the MRI of Turner's neck was abnormal and wrote that "[t]his all stems from a worker's comp claim when he fell and hit his neck, head, and shoulder area."

Turner was eventually referred to Dr. Gregory Lanford, who saw Turner for an independent medical examination ("IME") and a neurological evaluation on September 17, 2015. Dr. Lanford diagnosed right C6 radiculopathy, weakness in the right biceps, and absent right biceps jerk consistent with foraminal stenosis at C5-6 on the right. Dr. Lanford observed that Turner did not experience any of his current symptoms prior to the work injury. Dr. Lanford noted that Turner had failed conservative treatment and recommended a cervical fusion at C4-6. Dr. Lanford concluded that, without surgery, Turner would be at maximum medical improvement.

Dr. Paul Phillips, Jr., analyzed Dr. Lanford's surgical recommendation through a utilization review on September 29, 2015. Dr. Phillips found the requested anterior cervical fusion at C4-6 was not medically necessary

and appropriate as the records did not include significant findings of recent electrodiagnostic studies confirming negative cervical radiculopathy. Dr. Phillips indicated that the surgery was not pre-certified, because Turner had not undergone selective nerve root blocks.

Dr. Berkman, a neurosurgeon, also saw Turner at the request of the carrier. Dr. Berkman stated that the February 16, 2015, work-related injury caused a right shoulder injury, cervical sprain, and exasperation of pre-existing cervical spondylosis with a right C5 radiculopathy. Dr. Berkman recommended epidural steroid injections at the C4-5 on the right and additional physical therapy for the cervical spine problems.

The workers' compensation carrier ultimately denied the proposed cervical fusion, at which time there was a lapse in Turner's treatment. By July 6, 2016, however, Turner obtained private insurance coverage and began treating with Dr. John Yezerski for his shoulder and neck. Dr. Yezerski diagnosed a right rotator cuff tear and adhesive capsulitis of the right shoulder. Dr. Yezerski initially treated the condition conservatively with injections, but those measures failed and, on August 1, 2016, Dr. Yezerski performed a total shoulder replacement, which returned Turner to a functional range of motion and increased his strength. Dr. Yezerski opined that following the surgery Turner had a 14% impairment to the body as a whole.

Dr. Yezerski provided Turner with a number of restrictions, including prohibiting him from reaching overhead with his right arm. Since Turner had to climb ladders to perform his maintenance job at the penitentiary, this precluded Turner from returning to the type of work he was performing at the time of his injury. Dr. Yezerski indicated that Turner reached maximum medical improvement on September 13, 2017.

After the shoulder surgery, Turner again sought treatment for his neck pain. Because his insurance would not permit a return to Dr. Lanford, Turner visited Dr. Thomas Gruber on November 8, 2016, for neck pain and numbness. Dr. Gruber noted that Turner's issues were complicated insomuch as the cervical spine problems and right shoulder problems made it hard to differentiate the cause of pain. An MRI revealed degenerative disc disease with right foraminal stenosis at the C4-5 and C5-6 levels along with disc herniation at both levels. Dr. Gruber agreed with Dr. Lanford that a two-level fusion surgery was the appropriate treatment.

Dr. Gruber performed the fusion surgery on February 6, 2017. Turner indicated that his cervical condition improved after the surgery but he continued to experience some cervical stiffness. Dr. Gruber recommended trigger point injections to improve the stiffness. Following a July 11, 2017 visit, Dr. Gruber concluded Turner had reached maximum medical improvement for his neck

condition and could return to work. In an August 15, 2017, report, Dr. Gruber indicated that Turner's work injury exacerbated the pre-existing dormant, non-disabling degenerative conditions in Turner's cervical spine and concluded Turner had no active impairment rating prior to the injury. He assigned Turner a 25% impairment rating and gave him several restrictions regarding lifting loads over twenty pounds and turning his head.

On August 12, 2015, Dr. Gregory Gleis performed an IME. According to Dr. Gleis, a May 12, 2015 cervical spine x-ray and a June 25, 2015 cervical MRI revealed pre-existing degenerative changes. Dr. Gleis believed that while Turner's left shoulder condition was consistent with pain from the cervical spine and his initial right shoulder symptoms were consistent with an AC joint separation, Turner's symptoms were now suggestive of referred cervical pain. From Turner's examination and medical records, Dr. Gleis found sufficient correlation between the neck and right arm symptoms to conclude that the head contusion from the February 16, 2015, incident could have caused Turner's neck injury. He determined that Turner was not yet at maximum medical improvement for the cervical spine.

On April 3, 2018, Dr. Thomas O'Brien also conducted an IME. He diagnosed minor bruises/contusions to the shoulder, ribs, and hip as a result of the work incident. Dr. O'Brien concluded Turner did not sustain a permanent injury in

the fall; rather, Turner's rib and hip contusions resolved a few days after the incident and his shoulder pain improved. Dr. O'Brien, who did not review Turner's physical therapy records, emphasized that Turner did not complain of neck pain until almost two months after the work accident and relied upon his interpretation of the June 23, 2015, MRI scan of Turner's cervical spine. Dr. O'Brien concluded:

> Mr. Turner has a non-work-related, multilevel, cervical degenerative disc disease. The work activities of February 16, 2015, did not cause an injury to the cervical spine nor cause any type of temporary or permanent aggravation, acceleration or precipitation of this degenerative cervical condition above and beyond the natural history of progression of this condition in a middle-aged man. *The two-month hiatus where there are no symptoms of neck pain or cervical radiculopathy effectively rules out a causal association with Mr. Turner's neck symptoms and the ultimate surgical procedure that was carried out by Dr. Gruber in the form of a C4-C5, C5-C6 anterior cervical decompression and fusion procedure on February 6, 2017. Further support for my causation opinion comes from the objective imaging studies including the cervical MRI scan.* The cervical MRI scan dated June 23, 2015 depicts longstanding, mild, degenerative disc changes at C4-C5 and C5-C6 with no acute objective findings that can in any way be causally associated with an acute injury to the cervical spine resulting from the work incident of February 16, 2015.

(Record (R.) at 322) (emphasis added). Dr. O'Brien assessed a 0% impairment for the neck and opined Turner could have returned to unrestricted work by May 12, 2015.

Turner filed a Form 101 on November 11, 2018, seeking both temporary and permanent wage and medical benefits for his work-related injuries. In his Form 101, Turner alleged he sustained multiple injuries to multiple body parts when he slipped and fell at work on February 16, 2015. Following a final hearing, at which Turner testified, the ALJ rendered his initial decision on July 23, 2018. The ALJ relied heavily upon Dr. O'Brien's opinions and determined that Turner sustained only temporary injuries to the shoulder, ribs, and hip due to his work accident. The ALJ awarded Turner temporary benefits from the date of the accident until May 12, 2015, when he determined Turner had reached maximum improvement. Turner appealed to the Board.

On January 11, 2019, the Board issued an opinion vacating the ALJ's opinion and remanding the claim to the ALJ for a review of the evidence with particular regard to Dr. O'Brien's opinion. The Board acknowledged that Dr. O'Brien's opinion on causation was based in part on a partially incomplete medical history insomuch as it did not contain Turner's physical therapy records. The Board directed the ALJ to review Dr. O'Brien's opinion in the context of those records and provide additional findings related thereto.

On March 18, 2019, the ALJ issued his first decision on remand, again finding that Turner had sustained only temporary injuries. Despite the Board's directions on remand, the ALJ did not reference the physical therapy

-9-

records or explain whether he considered how Dr. O'Brien's failure to review those records as part of his IME might affect the reliability of Dr. O'Brien's final opinion.

Turner appealed, and on August 2, 2019, the Board rendered its second opinion vacating and remanding the ALJ's judgment. Although the Board had directed the ALJ to provide a summary of the Trigg County records, the ALJ failed to include the fact that Turner was experiencing cervical spine pain at his appointments and did not reference the March 24 and 31 physical therapy records in his summary. The Board noted that the ALJ's only reference to the physical therapy records was: "[w]hile there was some reference to neck symptoms made at a physical therapy visit on March 24, 2015, as well as a complaint to a nurse on April 6, 2015, the point made by Dr. O'Brien regarding the late onset of symptoms is still persuasive." (R. at 1056.) On remand, the Board refused to direct the ALJ to issue an opinion without considering Dr. O'Brien's medical opinions altogether as Turner requested; instead, it directed the ALJ to address all the records before him as they pertained to Turner's cervical condition and to explain that Dr. O'Brien did not review Turner's physical therapy records in the course of his evaluation.

On October 22, 2019, the ALJ rendered his second opinion on remand. The ALJ addressed the Trigg County physical therapy records briefly,

mentioning that Turner was seen on April 13, 2015, and referenced notes of shoulder impingement, cervical complaints, apparent range of motion measurements, and a possible Spurling's test. However, the ALJ ultimately found these records to be "illegible" and therefore of little evidentiary value. The ALJ again failed to discuss the March 2015 physical therapy records and reiterated his reliance upon Dr. O'Brien's opinions without accounting for the fact that Dr. O'Brien rendered his opinion without the benefit of having reviewed all the physical therapy records. The ALJ also noted the objective findings supporting Dr. O'Brien's opinions, including his review of the June 23, 2015, MRI.

Turner again appealed to the Board, arguing that the ALJ had once again failed to explain how he could rely on Dr. O'Brien's conclusion with respect to the cervical injury when it appeared that opinion incorrectly relied on the fact that Turner had not complained of cervical pain to any of his providers in the immediate aftermath of his fall. On February 7, 2020, the Board once again vacated and remanded the ALJ's judgment. The Board wrote:

> We note the ALJ has had multiple opportunities to provide an accurate review of the evidence but has failed to do so. In his latest decision, the ALJ only made a passing statement that the records from the Trigg County Hospital Rehabilitation Department are "illegible," and did not reference the physical therapy records. We must therefore, again vacate the ALJ's determinations, and remand for a complete review of the records, and those from the Trigg County Hospital Rehabilitation Department. The ALJ must then discuss the impact of

the information contained in those records upon Dr.
O'Brien's opinion. *After reviewing the evidence and the
impact, the ALJ may make any determination supported
by the evidence. We do not direct any particular result;
however, any decision must be based upon an accurate
review of the evidence and its impact.*

(R. at 1146) (emphasis added).

This time, Turner did not wait for the ALJ to render another opinion.

Instead, Turner petitioned our Court for review of the Board's opinion. Before us,

Turner argued the Board abused its discretion insomuch as it should have: (1) held

that Dr. O'Brien's opinion cannot constitute substantial evidence supporting the

ALJ's opinion; (2) and remanded the claim to the ALJ for new findings and

conclusions in conformity with that holding and without reference to or reliance

upon Dr. O'Brien's IME.

Following an extensive review of the record and case law, we

affirmed the Board, holding that Dr. O'Brien's failure to review the physical

therapy records did not require exclusion of his report. We explained:

> We are not convinced that the facts before us are
> analogous to those of *Cepero* [*v. Fabricated Metals
> Corp.*, 132 S.W.3d 839 (Ky. 2004)] or *Eddie's Service
> Center* [*v. Thomas*, 503 S.W.3d 881 (Ky. 2016)]. Rather,
> we are persuaded that the facts before us most closely
> resemble those of *GSI Commerce* [*v. Thompson*, 409
> S.W.3d 361, 365 (Ky. App. 2012)]. Turner accurately
> points out that Dr. O'Brien did not have the opportunity
> to review his full medical history, while the other doctors
> did. However, Dr. O'Brien did not arrive at his medical
> determination solely on the basis of the partially flawed

-12-

medical history before him. Dr. O'Brien's premise for concluding that Turner's injuries were not causally related to his work injury was not entirely based upon his somewhat incomplete medical history – it was also based upon his interpretation of objective medical data: Turner's June 23, 2015, MRI. Dr. O'Brien opined that the MRI "depicts longstanding, mild, degenerative disc changes at C4-C5 and C5-C6 with no acute objective findings that can in any way be causally associated with an acute injury to the cervical spine resulting from the work incident of February 16, 2015." R. at 322.

Additionally, we note that Dr. O'Brien states in his report that he based his opinion, at least partially, on the lack of reference to any neck pain for two months. Two months is approximately eight weeks. Turner fell on February 16, 2015. The first mention of neck pain in the physical therapy records is around March 24, 2015, a period of five weeks and one day, less than two months but greater than one month. It is entirely possible the ALJ could have determined that the physical therapy records would not have totally contradicted Dr. O'Brien's statements insomuch as Turner did not report neck pain to any medical provider in the days, weeks, or even first month following his fall. Turner also testified that his neck pain was not immediate, beginning a few weeks after his fall.

Based on our review of the records, we agree with the Board. Dr. O'Brien's opinion, although based in part on an incomplete review of all the medical records, is not so "substantially inaccurate or largely incomplete" that it could not be considered substantial evidence by the ALJ. *See Cepero*, 132 S.W.3d at 842. As such, we cannot disagree with the Board's decision refusing to direct the ALJ to reconsider the award without consideration of or reliance on Dr. O'Brien's opinion.

In this circumstance, evaluating the credibility and proper weight of Dr. O'Brien's report falls on the ALJ.

-13-

> *Paramount Foods, Inc. [v. Burkhardt*, 695 S.W.2d 418,
> 419 (Ky. 1985)]. The ALJ may determine whom and
> what to believe when there is conflicting evidence.
> *Pruitt v. Bugg Brothers*, 547 S.W.2d 123, 124 (Ky.
> 1977). The Board is charged with making sure the ALJ's
> opinion is based on an accurate understanding of the facts
> and evidence. To date, the ALJ's opinions have not
> demonstrated a sufficient understanding of the record to
> allow the Board to confidently conclude that the ALJ
> considered the scope of the issues before deciding that
> Dr. O'Brien's report was the most credible and reliable
> report before him. The Board cannot affirm the ALJ
> unless his determinations are based upon an accurate
> review of the evidence and its impact. The ALJ must
> provide a sufficient basis for his determination as the
> Board has directed. *Kentland Elkhorn Coal Corp. v.
> Yates*, 743 S.W.2d 47, 49 (Ky. App. 1988).

*Turner v. Department of Corrections*, No. 2020-CA-0330-WC, 2020 WL 6114559,

at \*8 (Ky. App. Oct. 16, 2020).

Hoping to put an end to the impasse between the ALJ and the Board,

we attempted to articulate how the ALJ might go about demonstrating to the Board

that he had an adequate understanding of the record. To this end, on remand, we

urged the ALJ to:

> separately discuss each of the following in as much detail
> as possible to provide the assurances the Board requires
> with respect to the record: (1) provide a summary and
> analysis of the March and April records at issue
> highlighting any complaints or references to
> cervical/neck pain or treatment; (2) summarize and
> explain his understanding of Dr. O'Brien's opinions
> regarding Turner's neck injury and the rationale
> underpinning those opinions, if any; (3) provide some
> explanation of whether Dr. O'Brien's failure to review

-14-

the records at issue affected the ALJ's assessment of the credibility and reliability of Dr. O'Brien's report, and the explanation for such determination; and (4) in light of any such determination explain how the ALJ considered Dr. O'Brien's opinion in comparison to the other opinions of record.

*Id.*

Finally, we reminded the Board that if the ALJ did so, "the Board must then accept the ALJ's ultimate findings so long as they are legally sufficient, as the Board ha[d] plainly determined that Dr. O'Brien's opinion is capable of serving as substantial evidence if supporting analysis is provided by the ALJ." *Id.*

On January 26, 2021, the ALJ rendered a remand opinion and order. In relevant part, it states:

> This matter is before the ALJ upon Remand from the Workers' Compensation Board with direction to provide additional findings in light of [Turner's] physical therapy records that indicate complaints of cervical pain that [Turner] related to the work injury as well as the suspicion referenced by Holly McCormick to the suspected cervical pathology. The prior findings and evidence summaries, specifically including the references to the physical therapist's conclusions and APRN Holly McCormick's notes as listed in the Opinion, Award and Order issued on July 23, 2018, are specifically incorporated herein by reference.
>
> 1. [Turner] in this matter alleged a work-related injury occurring on February 16, 2015. He presented to Trigg County Hospital and the medical records reference shoulder impingement, cervical complaints and a positive Spurling's test.

2.  The medical records of Holly McCormick, APRN indicate that [Turner] presented on February 23, 2015, a week after the fall at work, but did not complain of neck pain or issues.  [Turner] was referred to physical therapy and began to complain about radicular pain in the right upper extremity on March 24, 2015, and again on March 31, 2015.  On April 6, 2015, [Turner] reported having had some issues with neck pain since the work accident.  His physical therapist believed that his shoulder pain could have been work-related and cervical pathology was suspected per the office note of the same date.

. . .

5.  The ALJ has repeatedly found that the opinion of Dr. O'Brien is the most persuasive and convincing in this matter.  The ALJ acknowledges that the report of Dr. O'Brien includes a review of the records of Holly McCormick, APRN, but does not include a reference to [Turner's] cervical spine complaints or the much-discussed physical therapy records which include a reference to [Turner's] initial cervical spine complaints.  While this omission is unexplained, the poor image quality of the documents cannot be overlooked.

6.  The ALJ finds that these omissions by Dr. O'Brien do not diminish the substantial credibility of his opinions regarding [Turner's] condition.  The ALJ also notes that while Dr. O'Brien referenced a two-month delay in the reporting of symptoms by [Turner], the records referenced herein clearly limit that delay to approximately five weeks.  The ALJ also finds that this discrepancy has no effect on the credibility of the opinions offered by Dr. O'Brien.

. . .

8.  The ALJ finds that the failure by Dr. O'Brien to acknowledge that [Turner] complained about work-related cervical symptoms a few weeks earlier than he

-16-

previously believed, or that a nurse practitioner suspected cervical pathology, do not rise to the level articulated in *Cepero* that would constitute a medical history so inaccurate as to nullify his otherwise credible opinion.

9. The ALJ therefore finds that while Dr. O'Brien included a summary of the records of Holly McCormick but omitted any reference to cervical complaints or suspected pathology resulting therefrom, his understanding of [Turner's] medical history is not so inaccurate that it serves to diminish his ultimate conclusions. The ALJ therefore finds that his opinions are credible and convincing.

10. The ALJ continues to find that the report of Dr. O'Brien in this matter is the most comprehensive, thorough, and persuasive and further finds that ample substantial evidence as referenced hereinbefore supports his conclusions.

11. Dr. O'Brien assessed a 0% impairment for cervical spine and found that [Turner] reached maximum medical improvement and could return to work unrestricted on May 12, 2015. The opinions of Dr. O'Brien have convinced the ALJ and the ALJ thus finds that [Turner] sustained only temporary injuries that resolved as of May 12, 2015.

(R. 1555-58.)

Once again, Turner appealed to the Board. Turner argued to the Board that the ALJ failed to comply with this Court's directives. He requested the Board vacate the ALJ's remand opinion and send the case back down with directions that it be assigned to a different ALJ and that the new ALJ should reassess the evidence without consideration of Dr. O'Brien's IME report. This

time, however, the Board affirmed the ALJ concluding that his decision on remand contained the sufficient analysis required by the law of the case. Specifically, the Board stated:

> The Board previously remanded this claim on three occasions to insure the ALJ accurately summarized and understood the evidence, and performed a sufficient analysis in light of Dr. O'Brien's inaccurate statement that Turner had no cervical complaints until two months after the alleged February 16, 2015 injury.
>
> . . .
>
> On appeal, Turner argues the ALJ erred by failing to comply with the dictates of the Board and the Court of Appeals. Turner argues the ALJ did not provide a summary and analysis of the March and April 2015 records at issue highlighting any complaints and references to cervical/neck pain or treatment. Turner contends the ALJ's summary on remand remains insufficient, as the ALJ failed to discuss the limited range of motion and positive Spurling's test found in the physical therapy records from March 24, 2015 and April 13, 2015. Turner contends the ALJ did not adequately summarize and explain his understanding of Dr. O'Brien's opinions regarding the neck injury and the rationale underpinning those opinions. Turner contends the ALJ shows he did not review the evidence again, and he is confused about Dr. O'Brien's opinion regarding when the cervical pathology started. Finally, Turner notes the Court of Appeals directed the ALJ to explain how he considered Dr. O'Brien's opinion in comparison to the other opinions of record. Turner observes the ALJ made no reference on remand to the fact that six other medical experts indicated the cervical spine complaints were work-related.
>
> . . .

-18-

Since the first decision of the Board, we have noted that Dr. O'Brien's opinion on causation was not based solely on a mistaken belief that Turner had no cervical complaints for two months following the injury . . . Dr. O'Brien also formed his opinion based upon MRI studies that he stated revealed longstanding mild degenerative disc changes with no acute objective findings that can be associated with an acute injury resulting from the work incident. Dr. O'Brien stated the work injury did not cause any temporary or permanent aggravation, acceleration or precipitation of the degenerative cervical condition above the natural profession of this condition. Turner initially voiced no complaints of neck or radicular pain to Nurse McCormick when she saw him on week following the accident. He first reported neck complaints to her on Apri16, 2015, or seven weeks following the work incident. Turner voiced no complaint of neck problems to Dr. Chang until May 12, 2015, approximately three months following the incident and two months after beginning treatment with Dr. Chang.

We have repeatedly indicated we directed no particular finding regarding the weight to be given Dr. O'Brien's opinions. . . . [T]he Court of Appeals concluded it could not disagree with the Board's decision refusing to direct the ALJ to reconsider the award without consideration of, or reliance on, Dr. O'Brien's opinion. The Court further noted the evaluation of the credibility and proper weight to be given to Dr. O'Brien's opinion falls on the ALJ.

The Board's function is to determine whether the ALJ's decision is based upon an accurate understanding of the facts and evidence. Here, the ALJ found Dr. O'Brien's failure to acknowledge Turner complained about work-related cervical symptoms a few weeks earlier than he previously believed, or that a nurse practitioner suspected cervical pathology did not rise to the level of the inaccuracy articulated in *Cepero*

-19-

constituting a medical history so inaccurate as to nullify Dr. O'Brien's otherwise credible opinions. . . . Again we note, Dr. O'Brien also based his opinion on the type of changes reflected in the MRI. Based upon this evidence, the ALJ could reasonably believe the difference between a five-week delay and an eight-week delay would not significantly alter Dr. O'Brien's causation opinion.

. . .

In this instance, we determine the ALJ sufficiently provided the basis for his decision, supported by the evidence, and a contrary result is not compelled. While Turner has identified evidence supporting a different conclusion, there was substantial evidence presented to the contrary. As such the ALJ acted within his discretion to determine which evidence to rely upon, and it cannot be said the ALJ's conclusions are so unreasonable to compel a different result.

(R. at 1622-1633.) This appeal followed.

## II. STANDARD OF REVIEW

Pursuant to KRS[1] 342.285, the ALJ is the sole finder of fact in workers' compensation claims. Our courts have construed this authority to mean the ALJ has the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence and to draw reasonable inferences from that evidence. *Paramount Foods, Inc.*, 695 S.W.2d at 419; *McCloud v. Beth-Elkhorn Corp.*, 514 S.W.2d 46, 47 (Ky. 1974). Moreover, an ALJ has sole discretion to decide whom and what to believe and may reject any testimony and

---

[1] Kentucky Revised Statutes.

-20-

believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977). On review, neither the Board nor the appellate court can substitute its judgment for that of the ALJ as to the weight of evidence on questions of fact. *Shields v. Pittsburgh & Midway Coal Mining Co.*, 634 S.W.2d 440, 441 (Ky. App. 1982).

If the fact finder finds in favor of the person having the burden of proof, the burden on appeal is only to show that there was some substantial evidence to support the decision. *See Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). However, if the ALJ finds against the party having the burden of proof, the appellant must "show that the ALJ misapplied the law or that the evidence in [his] favor was so overwhelming that it compelled a favorable finding." *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005).

On appeal, our role "is to correct the Board only where . . . the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *ViWin Tech Windows & Doors, Inc. v. Ivey*, 621 S.W.3d 153, 157 (Ky. 2021) (quoting *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)).

## III. ANALYSIS

As he did before the Board, Turner argues to this Court that the ALJ's opinion on remand should be vacated and this matter remanded for a new determination without any reference whatsoever to Dr. O'Brien's medical opinions. However, as the Board correctly noted, such a result would be inconsistent with this Court's prior opinion. The last time this case was before us, we explicitly held that Dr. O'Brien's opinion was not so faulty or so substantially incomplete as to require its exclusion.[2] Furthermore, we agreed with the Board that the ALJ could rely on the opinion as long it was clear that he had a proper understanding of what Dr. O'Brien did and did not rely on in reaching his opinion and made a reasoned decision to rely on it notwithstanding its shortcomings.

To this end, we urged the ALJ on remand to provide a more complete analysis of his understanding of Dr. O'Brien's report and the other evidence of record. The ALJ's remand opinion, which incorporated his prior opinions by reference, substantially complies with our directives. The ALJ correctly observed that Dr. O'Brien was off by a few weeks in his assessment of when Turner first complained of neck pain and that Dr. O'Brien had not reviewed Turner's physical

---

[2]  We note that since our initial remand, the Kentucky Supreme Court has continued to apply *Cepero* consistent with our prior analysis. *See Yahagi America Molding, Inc. v. Craine*, No. 2021-SC-0262-WC, 2022 WL 17726210, at *5 (Ky. Dec. 15, 2022); *Papineau v. Trans Ash Inc.*, No. 2020-SC-0296-WC, 2021 WL 2617124, at *12 (Ky. Jun. 17, 2021); *Packers Sanitation Services v. Cabrera*, No. 2020-SC-0215-WC, 2021 WL 1133613, at *3 (Ky. Mar. 25, 2021).

therapy records. Nevertheless, the ALJ pointed out it is clear from the evidence of record that Turner did not affirmatively complain of neck pain until several weeks after his fall, which is consistent with Dr. O'Brien's statements, even if those statements are off by a week or two. The ALJ further noted that he was persuaded by Dr. O'Brien's opinion because it was based on subsequent imaging of Turner's cervical spine. The ALJ determined that the imaging and Dr. O'Brien's assessment that the cervical changes were degenerative overrode his minor misstatement of the dates and his failure to reference having reviewed the physical therapy records.

We are cognizant that there are several other medical opinions in the record that are at odds with Dr. O'Brien's opinion; however, proof is not a numbers game. The ALJ was not required to discount Dr. O'Brien's report simply because it was in the minority. The ALJ was free to pick and choose which evidence he found most convincing.

"No purpose is served by second-guessing such judgment calls, let alone third-guessing them." *Western Baptist Hosp.*, 827 S.W.2d at 687. "[T]his debatable issue has already been fully debated and reasonably resolved. It merits no further consideration." *Id*. at 688. The fact that the ALJ decided this case in a way that differed from how this Court or even the Board might have decided the case is not a basis for reversal.

## IV. Conclusion

For the reasons set forth above, we affirm the Board's June 18, 2021, opinion.

ALL CONCUR.

BRIEF FOR APPELLANT:

Jeffery A. Roberts
Murray, Kentucky

BRIEF FOR APPELLEE
COMMONWEALTH OF
KENTUCKY, DEPARTMENT OF
CORRECTIONS:

Sara May
Pikeville, Kentucky